D. John McKay
Law Offices of D. John McKay
117 E. Cook Ave.
Anchorage, Alaska  99501
Telephone:  (907) 274-3154
Facsimile:   (907) 272-5646
E-mail:   mckay@alaska.net

Attorney for  Respondent James B. Gottstein

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

———————————————x
                              )
In re: ZYPREXA                )          07-0504 (JBW)
PRODUCTS LIABILITY LITIGATION )
                              )
———————————————x
04-MDL-1596 (JBW)  [Related]

### RESPONSE OF JAMES B. GOTTSTEIN TO
### ELI LILLY AND COMPANY'S REQUEST TO MODIFY AND EXTEND
### TEMPORARY MANDATORY INJUNCTION AND
### IN SUPPORT OF MR. GOTTSTEIN'S MOTION TO DISSOLVE INJUNCTION

**Introduction**

Sometimes a fact is just a fact.  Goliath failed to duck in time, though he had

reasonable notice.  The Israelites were legitimately entitled to the benefits resulting from

this, however unanticipated.[1]  Eli Lilly & Company ("Lilly") failed to object before the

Zyprexa Documents subpoenaed by attorney James Gottstein in December 2006 were

produced and made public, despite being given the requisite written notice and a

reasonable opportunity to do so as provided in this court's protective order ("CMO-3",

¶14).  Accordingly, as a matter of fact and law, there was no violation of CMO-3.  So,

_____

[1]  1 Samuel 17:1-58

despite the many interesting legal issues associated with this matter, its resolution — in its entirety — is straightforward. In particular, this response will demonstrate that Lilly is not entitled to an injunction or other equitable or legal relief, as CMO-3 was not violated, because 1) Lilly had a "reasonable opportunity to object" — the only thing the MDL parties chose to require — (§III.D, *infra*), and 2) unbeknownst to Respondents until now, Lilly had already caused the Zyprexa Documents to lose their confidentiality status a year before Mr. Gottstein issued his subpoena (§III.B, *infra)*.

## II.  The Court Should Find CMO-3 Void Ab Initio, and Accordingly Find No Violation

Dr. David Egilman and attorney James Gottstein complied, literally, with CMO-3. Nothing more was required, and the court's protective order was not violated. However, as an independently adequate ground for rejecting Lilly's petition, the court should find CMO-3 is void, *ab initio*, because it impermissibly reverses the presumption of Rule 26 and allows a party to enforce a secrecy regime on documents of critical importance to the nation's debate on health, safety, and other issues of immense public interest. Mr. Gottstein understands that CMO-3 represents the "way things are done," and appreciates the appeal of expediency. But he also notes that the record reflects that the court did not draft this court order, the interested parties did. The court should send a signal that parties will need to do better than this — better than cavalierly making 15,000,000 pages of documents secret (except for the few hundreds of pages mentioned in Lilly's Memo, at 12, n. 10 — documents its counsel had previously certified "in good faith" as requiring confidentiality but that apparently didn't pass the red-face test this time around) *without* regard for the long-established burdens on the moving party. The abuses of this process, and the intimidating opposition and other significant obstacles that keep the public from

being able to fight overreaching secrecy agreements even if they know about them, suggest that we should go "back to basics." *See*, *e.g., In re: "Agent Orange" Prod. Liab.Litig.,* 104 F.R.D. 559 (E.D.N.Y. 1985) (lifting blanket protective order and requiring the defendants to bear the burden, through motion on notice, of establishing why particular documents should be designated confidential.

### III. Lilly Has Failed To Establish That The Documents At Issue Were Produced To Mr. Gottstein In Violation Of CMO-3

#### A. Lilly Failed to Meet Its Burden of Proof

Regardless of which party has the burden, the record amply demonstrates that it is Mr. Gottstein and the other Respondents, and not Lilly, who are entitled to relief from the court at this time. Should the court find the record is not sufficiently clear in any material respect, however, it should bear in mind that it is Lilly that has the burden of proof here. Lilly consciously chose not to call any number of witnesses who had relevant evidence — though in the end, the facts are the facts and would still compel the same result — and must live with the consequences of the failure to meet its burden. This is especially significant here, as Lilly should bear a heightened burden to justify the onerous restraints it seeks on important, First Amendment-protected activity. "A preliminary injunction is a prior restraint, and as such, "bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Nearly thirty years ago, in *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971), the Supreme Court struck as unconstitutional a state court's order enjoining distribution of leaflets critical of the respondent's business practices," cited in *Bihari v. Gross*, 119 F.Supp.2d 309 (S.D.N.Y. 2000). *See* also, *Nebraska Press Ass'n. v. Stuart,* 427 U.S. 539, 570, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)

(rejecting prior restraint issued to ensure protection of criminal defendant's Sixth Amendment right to a fair trial); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (even during wartime, newspapers not enjoined from publishing papers that government feared could threaten national security).

Lilly seeks to continue and extend an injunction issued by this court that, *inter alia,* prohibits further distribution or dissemination of the documents obtained by Mr. Gottstein pursuant to his subpoena issued in *In re: Guardianship of B.B.,* Case No. 3AN-04-545 P/G, Alaska Superior Court, Third Judicial District at Anchorage., in compliance with CMO-3.  Lilly, of course, has the burden of proving that it is entitled to any such injunctive relief.  (Tr. 1/16, at 7*).*  The court set on the hearing on this matter with nearly two weeks notice, and gave Lilly and others ample notice that this would be a "full evidentiary hearing" with respect to any continuation of the injunction. (TR. 1/8 at  27). The court made clear that in meeting its burden, Lilly could not rely on the Findings of alleged fact it was able to secure from the interim judge, and that it was coming into the hearing at which it would need to establish on the record all evidence necessary to justify the relief it seeks.[2]

In particular, the court directed: "If you're going to have any witnesses (at the January 16-17 hearing), please, give each other notice of the witnesses and the substance

---

[2]  Specifically, the court noted in setting on the  January 16-17 hearing: " I make no findings of fact with respect to whether any violation of any order of this court has ever been made. I have heard no evidence on the point and I'm not prepared to draw any inferences from any of the materials before me." (Tr. of January 3, 2007, Hrg. at 29.) At the following hearing, the court emphasized again that it has made "no finding" in this regard, Tr. of January 8, 2007, Hrg. at 28, and it underscored this as well by the striking from the January 4 Order to Show Cause prepared by Lilly Lilly's characterization of Mr. Gottstein's dissemination of the documents at issue as "improper."

of the testimony." (Tr. 1/8 at 27)  Not only did Lilly fail to provide any such information, it affirmatively represented to the court in a January 12 letter from Lilly counsel Nina Gussack, "We do not intend to call any witnesses."   *See,* Ex. 2 to accompanying Declaration of counsel.  Lilly could have called Dr. Egilman, but it chose not to and should not now be allowed to circumvent its failure to carry its burden in every respect by making up what they think the facts might have been had they attempted to do so.  It clearly could have called Mr. Armitage or other lawyers who were responsible for failing to object to the subpoena when they had a reasonable opportunity to do so (just as they called PSC attorney Richard Meadow when it suited their purpose), but they didn't.   This is not surprising, because doing so would have simply underscored the only fact necessary for deciding this case — that Lilly failed to object before the subpoenaed documents were produced, though it had a reasonable opportunity to do so.

Lilly's choice not to present any witnesses to provide evidence on this central issue — when such witness and the relevant facts totally within their control —coupled with their burden of proof and the undisputed evidence that they had a reasonable opportunity to object before the subpoenaed documents were released, leaves no doubt about the proper outcome of this case.   Lilly has failed to meet its burden to show that it had no reasonable opportunity to object before the subpoenaed documents were produced.  Though the burden of proof is not theirs, Respondents clearly and indisputably demonstrated that Lilly did have a reasonable opportunity to object before the subpoenaed documents were produced, and failed to do so.  Accordingly, as a matter of fact and law, there was no violation of CMO-3.  Thus, Mr. Gottstein's receipt and use of

the Zyprexa Documents was lawful, as was any receipt and use of these Documents by anyone to whom he made them available.

**B. CMO-3 Only Applies to Confidential Documents; The Zyprexa Documents Had Already Lost Their Confidential Status Due To Lilly's Undisclosed First Failure to Timely Object, Pursuant to CMO-3, ¶9, in December 2005**

Eli Lilly trumpets the necessity of being able to rely upon enforcement of the court's protective orders. *Cf.*, Memo at 2. Mr. Gottstein agrees, and believes he received the Documents in compliance with CMO-3, ¶14. He should be free now to make use of these documents in his Alaska litigation without further interference by Lilly, pursuant to ¶14, if the court's protective order is going to be enforced according to its terms. In addition, however, the injunctions against him and all Respondents are premised on the alleged confidentiality of the Documents. If the documents produced were not confidential, there would be no violation even had CMO-3, ¶14 not been complied with (which it was). In fact, if we can rely upon enforcement of the terms of the court's protective order, the Documents had lost their confidential status in December 2005, pursuant to CMO-3, ¶9(d). *See*, Declaration of D. John McKay, ¶4. Upon information and belief, the Third Party Payor ("TPP") Plaintiffs filed a motion in late 2005 pursuant to ¶9(b) disputing Lilly's designation of Zyprexa Documents as confidential, and pursued the process set forth in ¶9 for this purpose. Lilly was required to file a motion within 45 days if it wanted to maintain the Documents as confidential documents, but failed to do so. *Id.*

CMO-3, ¶9(d) is unequivocal and self-executing. It provides, in pertinent part: "If the time for filing a motion, as provided in paragraph 9(c), has expired without the filing of any such motion … **the Confidential Discovery Material shall lose its confidential**

**status.**" (emphasis added)

We do not know to what extent the court was or is aware of this directly related matter.[3]  In light of this, Mr. Gottstein asks that the court — subject to verifying the dates on the parties pleadings to confirm that Lilly did not, in fact, file a 9(c) motion within 45 days after the TPP motion triggering its time for doing so — dissolve all injunctions against any of the respondents forthwith, restore the *status quo ante* by ordering a return of the Documents to those who forwarded them to the Special Master, and provide such other and further relief to Respondents as may be appropriate.

### C.  The Context and Relevant History of CMO-3 Underscore That The Parties Chose The Ambiguous Language and Minimal Notice Requirement of ¶14

CMO-3 was drafted and negotiated by the parties to this case, to meet their needs. They provided for 45 days to file a motion to prevent documents from automatically losing their confidentiality status pursuant to a ¶9(b) motion.  They provided that certain Customers or Competitors of Lilly can be given trade secrets or other confidential documents if Lilly does not file a motion objecting to the proposed disclosure "within three (3) business days" after advance notice that "such disclosure will be made." (CMO-3, ¶6 at p. 6)  And, with respect to subpoenas that might be issued for Confidential Documents, Lilly and the Plaintiffs chose to eliminate the requirement in ¶14 of the draft CMO-3 that the person to whom the subpoena is directed "shall not provide or otherwise

---

        [3]  We know Lilly did not disclose it to Respondents throughout the entirety of these proceedings in which it has been asserting in pleadings and arguments to the court that the Documents are properly confidential under CMO-3, and indeed, has even suggested that a future ¶9 process would be necessary before the court could consider whether these documents should be confidential.  *Cf.*, section VI, *infra*, re: Unclean Hands.

disclose such discovery materials until (10) business days after notifying counsel for the designating party in writing of (the same items as required by ¶14 as finally adopted)." (04-MDL-1596  Dkt. 45 at 17 of 26) Why did they agree to this ambiguous but predictably shorter time period?  We only know that the parties' deliberate ambiguity cannot be asserted against those, like Dr. Egilman and Mr. Gottstein, who complied with its terms as written.  It seems likely, however, that the present ¶14 incorporates a simple and workable trade-off: the time for releasing documents is potentially dramatically shorter, but in return, all that is required of Lilly is a phone call, or an e-mail, or a fax, or some other simple form of noting an "objection," and not the filing of an actual motion in court, as in ¶s 6 or 9(b).

### D.  There Can Be No Question That There Was A Reasonable Opportunity for Lilly's Counsel to Object Before the Documents Were Produced In Response to The Subpoena.

There are two, and only two, elements that must be shown to establish that Dr. Egilman complied with CMO-3 in producing the Documents to attorney James Gottstein. Lilly does not dispute the first, that Dr. Egilman gave the requisite, detailed notice required by ¶14 — nor could it, as he scrupulously and immediately complied with this provision of the protective order.

The second, the question on which this entire case turns, is breathtakingly simple: Did Lilly have "a reasonable opportunity to object" before Dr. Egilman turned over the documents in response to the subpoena.[4]  The record is clear that it did.

----

[4]  Lilly has made much ado about what it calls a "secret subpoena," issued by Mr. Gottstein, and attempts to portray Mr. Gottstein's conscientiousness in a negative light. The record is clear that at least with respect to Mr. Gottstein, obtaining and sending this amendment was quite proper; the only questions relate to what Dr. Egilman did or didn't do with it.  This is a red herring, however, as there is not a scintilla of evidence that Lilly

It is undisputed that:

• Lilly received the requisite notice from Dr. Egilman on Wednesday, December 6, the same day it the subpoena was served on him. (Tr. 1/17 at 140)  It is undisputed that this notice gave Lilly Dr. Egilman's address, his office phone number, his cell phone number and his e-mail address.  (Tr. 1/17 at 141)

• The notice provided Mr. Gottstein's address and phone number.  (Tr. 1/17 Hr'g at 143).

• It is undisputed that if Lilly had made a single, simple objection as CMO-3, ¶14 contemplates by telling either Dr. Egilman or Mr. Gottstein, by letter, fax, phone call, e-mail, or otherwise, "we object," or "don't do anything until you hear from us," attorney Gottstein would not have taken the documents from Dr. Egilman had he given them to him.  (Tr. 1/17 at 142-143).

• It is undisputed that Lilly did not make a single call, or send an e-mail, or otherwise object to his production of documents pursuant to the subpoena until after he had done so, and likewise that Lilly never told Mr. Gottstein that it objected to the subpoena before the documents were released — despite a reasonable opportunity for it to have done so on Wednesday, December 6, Thursday, December  7, Friday, December 8, Saturday, December 9, Sunday, December 10, Monday, December 11, and Tuesday, December 12.

---

ever relied on this document — and by definition it couldn't have, since they acknowledge they were unaware of it.  Lilly has made no showing, nor could it, that its not knowing about this document caused its failure to object, or deprived it of the opportunity to object, on Wednesday, Thursday, Friday, Saturday, Sunday, Monday, or Tuesday. So, as a matter of undisputed fact it has no bearing on the sole question relevant to deciding whether there was compliance with CMO-3, ¶14:  Did Lilly have a "reasonable opportunity to object" between Wednesday, December 6 and Tuesday, December 12.

In virtually any scenario, having nearly a week as Lilly did here (from Wednesday through Tuesday) would provide ample opportunity even for someone who had to use a payphone or a public library to make a call or send an e-mail lodging a simple objection. That Lilly has scores of lawyers working on this case, who work aggressively and competently days and nights, weekdays and weekends, and are facile with the electronic communications as well as more traditional technology, simply leaves no room for a factual or legal conclusion that Lilly did not have "a reasonable opportunity to object." And with all due respect, no further finding is needed to dispose of all aspects of this entire case.

Two examples should suffice to drive home this point, should there be any question about it.

•  First, in the first week after Mr. Gottstein was enjoined, his counsel received over a dozen e-mails from one Lilly lawyer over four days — fewer days than elapsed between Dr. Egilman's notice to Lilly and his production of the Documents.  These included e-mails sent by Lilly counsel at all hours of the day and evening, including 1:29 a.m., 2:10 a.m., 3:00 am and 3:04 a.m., *See*, accompanying Decl. of D. John McKay, ¶7 at p. 5.

• The second is an illustration of Lilly objecting, within a timespan of less than 24 hours, to one person it claimed was facilitating dissemination of the Documents.  It bears reviewing in detail, because it belies any possible claim that Lilly could not have mustered the time or resources to send an email, fax or phone call to either Dr. Egilman or Mr. Gottstein during the period of nearly a week from Lilly's receipt of the subpoena until the documents were produced:

Judge Cogan issued his Order for Temporary Mandatory Injunction giving rise to the instant proceedings at 4 p.m., Friday, December 29.   According to documents Lilly has filed as exhibits, *shortly after midnight* that night, Lilly counsel Sean Fahey was e-mailing an individual who was not named in Judge Cogan's order insisting that he immediately remove from his website a link to a specific named internet file (where, presumably, Lilly believed the Zyprexa Documents were available to anyone who visited the site).  (Lilly Ex. 25/Pet. 7  07891)  Mr. Fahey wrote the recipient of this e-mail, Eric Whalen, that he was "facilitating the violation of a Federal Court order," and threatened to take "further legal action against your website," if Mr. Whalen did not do as he was told.  *Id.*   Mr. Whalen sent Mr. Fahey an e-mail reply at 8:41 a.m. Saturday, December 30, 2006, stating that he was unaware he was under any court order, that the documents he linked to had been downloaded from an anonymous source, and that dissemination of the documents was in the public interest, and asked Mr. Fahey if there was a legal basis for his request.  *Two hours later, on Saturday at 10:46 a.m.*, Mr. Fahey wrote back, advising Mr. Whalen that Judge Cogan's order applied to him, because Lilly had "obtained several statements by members of the organization you are involved with (mindfreedom), which directly demonstrate these are the Gottstein documents."  Mr. Fahey repeated the demand that Whalen "must take down the link immediately, or we will take further legal action to shut down your website, and seek all available remedies."  *An hour and a half later*, apparently having received no reply, Mr. Fahey sends Mr. Whalen another e-mail at 12:02 p.m.:  "*I need to know your intentions promptly, sir.*"  Finally, *a couple hours later*, at 2:16 p.m., Mr. Fahey sent another e-mail attaching a copy of the earlier referenced order, stating that Lilly's "independent research" confirms

that the documents available for download are those obtained by Mr. Gottstein, and, *inter alia,* stating: "*You have been on notice for several hours now* that you are operating in violation of a Federal Court Order, and you have thus far refused to assure your compliance.  Please shut down the link immediately, remove any cached material immediately, and confirm that you will comply with the attached order." (*Id.* Pet. 7 0791.) (Emphasis added)  These are people who know how to make a timely objection. The record clearly shows they are capable of recognizing a reasonable opportunity and acting on it.

> **IV.  Even If Dr. Egilman Were Found To Have Violated CMO-3, Mr. Gottstein Did Not, Nor Did He Act Improperly When He Received and Made Use of the Documents He Had Subpoenaed; The Activity Lilly Labels "Conspiracy" or "Aiding and Abetting" Is Not Only Contemplated By and In Compliance with CMO-3, But Constitutionally Protected As Well**

Did Dr. Egilman do something wrong if he contacted Mr. Gottstein and made him aware of the existence of documents that might be of substantial interest to Mr. Gottstein's public interest law firm, without revealing the contents of the Document, and making clear that they could only be provided pursuant to provisions of a protective order?  We don't believe so, but we recognize that is something the court may decide at some point.

The record is clear, however, that once Mr. Gottstein had been made aware of the existence of these documents that had such an obvious importance to the clients and causes he represents, he had a legitimate and real interest in securing them and using them to help those served by public interest firm, Law Project for Psychiatric Rights

(PsychRights®).[5]  While the relevant legal issue here is whether Lilly had a reasonable opportunity to object, it is worth noting that there is no dispute in the record that Mr. Gottstein's aims and means were at all times legitimate, and in no way designed to violate CMO-3 or otherwise act improperly.  He is still waiting for and fully intends to use the Documents in his case , as he intends to use the testimony and related documents from the other expert he subpoenaed the same day, Dr. Grace Jackson.  *Id.*

Mr. Gottstein's receipt and use of these documents, and consequently, the receipt and use of the documents by any who obtained them from or through him, is constitutionally protected for the additional reasons set forth in Florida Star v. BJF, 491 U.S. 524 (1989) (protection of First Amendment extends to lawfully obtained information, and precluded punishment of newspaper for publishing the name of a rape victim that had been obtained from a police report released to the paper, even though the publication violated a Florida statute and the newspaper's own internal policy, and the sheriff's department had apparently failed to fulfill its obligation not to cause or allow the name to be published.)

Lilly's attempt to enjoin Mr. Gottstein and others based on an alleged "scheme" or "conspiracy" with New York Times reporter Alex Berenson (*see,* Lilly proposed

---

[5] The fact that he didn't undertake the *B.B.* litigation specifically until he had a reason to do so is immaterial, and not particularly remarkable.  The undisputed evidence in the record shows that while he undertook the specific case in response to the new opportunity to advance PyschRights' mission, Mr. Gottstein is and has been engaged in strategic litigation on a continuing basis, through appropriate cases as opportunities present themselves, to advocate against forced drugging and electroshock and otherwise advance the rights of  those diagnosed with mental illnesses.  History shows many important civil rights cases didn't "just happen;" they were undertaken by admirable lawyers, ready and willing to devote their time and legal talent when an opportunity arose to advance issues of importance.   And there should be no mistake that battles for civil rights continue today, on many fronts.

Findings, at p. 5, and at p. 30, n.5)  is inaccurate as a matter of fact and law, and

impermissibly interferes with protected First Amendment activity.  *See, Nicholson v.*

*McClatchy Newspapers,* 177 Cal. App. 3d 509, 223 Cal. Rptr. 58 (Cal.App. 1986).  The

record shows that Mr. Berenson was interested in the Zyprexa litigation and documents

relating to Zyprexa.  This is hardly surprising.  Ferreting out and reporting information

about matters affecting public health is his job, and the court can take notice of the fact

that he has covered the Zyprexa litigation and other pharmaceutical industry issues for

one of the nation's most prominent and respected press organizations.  *See, e.g.,*

Berenson "Lilly to Pay $690 Million in Drug Suits," *New York Times,* June 10, 2005

(announcing the first settlement, of 8,000 Zyprexa claims, and noting that plaintiffs'

lawyers had bound themselves not to make documents obtained in discovery public.)

Newsgathering is constitutionally protected, for "without some protection for seeking out

the news, freedom of the press could be eviscerated."  *Branzburg v. Hayes*, 408 U.S. 665,

707 and 681, 92 S.Ct . 2646, 2656, 33 L.Ed..2d 626, 639 (1972).

> The First Amendment therefore bars interference with this traditional
> function of a free press in seeking out information by asking questions.
> Thus it is that "a journalist is free to seek out sources of information not
> available to members of the general public … Consequently, the news
> gathering component of the freedom of the press — the right to seek out
> information — is privileged at least to the extent it involves "routine …
> reporting techniques."  (See *Smith v. Daily Mail Publishing Co.,* supra, 442
> U.S. at p. 103, 99 S.Ct. at p. 2671, 61 L.Ed.2d at p. 405.)  Such techniques,
> of course, include asking persons questions, including those with
> confidential or restricted information.  While the government may desire to
> keep some proceedings confidential and may impose the duty upon
> participants to maintain confidentiality, it may not impose criminal or civil
> liability upon the press for obtaining and publishing newsworthy
> information through routine reporting techniques. (See *Landmark
> Communications, Inc. v. Virginia,* supra, 435 U.S. at pp. 837-38, 98 S.Ct. at
> 1340-41, 56 L.Ed.2d at p. 9.)

Nicholson, 177 Cal. App.3d at 519-520.  "It is the right to ask, not the right to receive that is at stake here. … Of course, 'the Press is free to try to uncover, and if it succeeds it is free to publish' the information that the government attempts to conceal."  *Id. at n.5*

The plaintiff's complaint in *Nicholson* was that the press had "pursued and conducted an unreasonably intrusive investigation into Plaintiff's confidential and private affairs by means of soliciting, inquiring, requesting and persuading agents, employees and members of the State Bar to engage in the unauthorized and unlawful disclosure of information [knowing such information to be confidential]."  The court found such activity constitutionally protected:

> This allegation simply states that the media defendants sought out the newsworthy information which they subsequently published.   This type of activity, at least, is within the news gathering activities which are protected by the First Amendment.  (See *Branzburg v. Hayes*, supra, 408 U.S. at pp. 681, 707, 92 S.Ct. at pp. 2656, 2669, 33 L.Ed.2d at pp. 639, 655.)   Since those activities are protected by the First Amendment, state law may not impinge upon them by characterizing the activities as tortious.   Stated differently, the constitutional protection accorded normal news gathering activities does not depend upon the characterization of the cause of action seeking to impose sanctions upon its exercise (including characterization of behavior as "contempt" or "advocacy of unlawful behavior").

177 Cal.App.3d at 520.  The court in *Nicholson* noted that it doesn't matter what you call it, because "[f]or the same reason that 'liability cannot be imposed on any theory for what has been determined to be constitutionally protected publication … it cannot be imposed for constitutionally protected news gathering."  *Id., 177 Cal.App.3d at 520-21(citation omitted)*

The court specifically rejected an attempt to equate newsgathering that involved seeking confidential information with *conspiracy*:

> As part of his general allegations plaintiff alleged that the defendants "conspired and agreed among themselves to disclose [the confidential material at issue] to

- 15 -

unauthorized persons and for unauthorized purposes."  He further alleged that the defendants committed the acts of disclosure in furtherance of their conspiracy. Given the other alleged facts of this case, the conclusory allegation of a conspiracy cannot serve to transform privileged behavior of the media defendants into tortious misbehavior.

"The gist of an action charging civil conspiracy is not the conspiracy but the damages suffered."  … Conspiracy is not in itself a tort;  it is simply a legal theory which will render all the participating members responsible for the wrong committed.  … In order to state a cause of action based upon a conspiracy theory the plaintiff must allege the formation and operation of the conspiracy, the wrongful act or acts done pursuant to it, and the damage resulting from such acts. …  In making such allegations bare legal conclusions, inferences, generalities, presumptions, and conclusions are insufficient.… This rule has particular applicability here where the alleged object of the conspiracy, the publication of newsworthy information, is a matter the media defendants were constitutionally privileged to do and the only acts the defendants are alleged to have done pursuant to the conspiracy were privileged.   Under such circumstances plaintiff cannot be permitted to avoid the effect of the constitutional privilege by the mere artifice of alleging that defendants acted pursuant to a conspiracy …   In essence, plaintiff alleged a mutual agreement between the members of the press and others to gather newsworthy information about a public figure in a constitutionally protected fashion and then to print it.   That allegation simply cannot, consistent with the Freedom of the Press Clause of the First Amendment, give rise to a cause of action in tort.

*Id. at 521-22.*  (internal cites omitted) (emphasis added) Alex Berenson was not a conspirator, he was a news reporter.   Even though he would have been constitutionally protected to ask someone to improperly disclose confidentially material, that is not what he did here.  There is nothing in the record to show that he did more than suggest the possibility and means of a release of the documents pursuant to a subpoena, as expressly anticipated by, and fully in compliance with, the Protective Order. CMO-3, ¶14.

The same result obtains with respect to Lilly's efforts to label Mr. Gottstein an "aider and abettor," "conspirator," or otherwise improper actor.  It is useful to remember that when lawyers undertake to advocate for their clients, particularly on matters of public interest in suits aimed at championing the civil rights of a class of individuals not in a position to readily protect their own interests against the powers of the government,

- 16 -

that is not only engaging in activity that exemplifies the highest ideals of the legal

profession, but in activity that is protected by the First Amendment as well.

The First Amendment protects "engag(ing) in litigation as a vehicle for effective

political expression and association, as well as a means of communicating useful

information to the public. … cf. *Bates v. State Bar of Arizona,* 433 U.S., at 364, 97 S.Ct.,

at 2699; *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748,

779-780, 96 S.Ct. 1817, 1834, 48 L.Ed.2d 346 (1976) (Stewart, J., concurring).   As

(NAACP v. *Button* indicates … the efficacy of litigation as a means of advancing the

cause of civil liberties often depends on the ability to make legal assistance available to

suitable litigants. *In re: Primus*, 436 U.S. 412, 431, 98 S.Ct. 1893, 56 L.Ed.2d 417

(1978).  Similarly, the solicitation of prospective litigants by a group pursuing public

interest litigation, including those with no prior connection with the group, "for the

purpose of furthering the civil-rights objectives of the organization and its members was

held to come within the right " 'to engage in association for the advancement of beliefs

and ideas.' " *Id.,* at 430, 83 S.Ct., at 336, quoting *NAACP v. Alabama,* 357 U.S. 449,

460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958).  *Id.,* 436 U.S. at 423-424.

Representing the interests of those diagnosed with serious mental illnesses

through the Law Project for Psychiatric Rights, as Mr. Gottstein has for years and

continues at this moment through his representation of "B.B." and otherwise, is an

activity squarely within the First Amendment, and this includes posting documents on

this firm's valuable website, or subpoenaing documents or having documents evaluated

by experts in connection with the firm's strategic litigation.  The evidence in the record is

undisputed that attorney Gottstein was made aware of the relevant provisions of the

protective order from his initial contact with Dr. Egilman, that it was his intention to

complying with this protective order, and that he scrupulously acted to comply with

CMO-3, ¶14.

> **V.  The Court Should Reject Lilly's Argument That a Standard
> Less Protective of First Amendment Rights Should Be Applied Here
> Because Their Interest In Suppressing the Zyprexa Documents Is
> Merely "Content-Neutral"**

Lilly argues that the traditional, strong First Amendment protections and

presumptions against prior restraint do not apply here, because the secrecy they are

asking this court to enforce is "content neutral."[6]  Their arguments, as well as the facts,

belie this claim.  Aside from other problems with this assertion, their claim that the

injunctive relief they request is simply a content-neutral enforcement of CMO-3 rests on

the false premise that CMO-3 itself is "content-neutral" and that the reasons they want

the court to use it to suppress the Zyprexa Documents are content neutral.

---

[6]  Even if this were the proper standard, the relief requested by Lilly fails to pass
muster, for the reasons noted in other briefing, and because it burdens more speech than
necessary, and is not unrelated to the expression of ideas. *Compare,* DVD Copy Control
Assoc., 116 Cal. App. 4th 241 (Ct. App. 2004), in which on remand, after the decision
cited by Lilly in its Memo, the court of appeals determined that the preliminary
injunction was an unlawful prior restraint because since the encryption technology was
widely copied and republished, even if initially misappropriated, the rationales
underpinning the injunction, likelihood of success on the merits and irreparable harm to
the trade association, were not present and the injunction burdened more speech than
necessary. *See also, Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir.
2004), cert. denied, 125 S.Ct. 1825 (2005) (Ninth Circuit held that to the extent the
injunction barred defendant's sites from linking to other sites containing negative
commentary about plaintiff and the litigation it violated the first amendment because such
speech is informational, not commercial.)   And see *Bihari v. Gross*, supra, 119
F.Supp.2d at 326.  (using website to harass plaintiff to settle litigation not sufficiently
exceptional circumstances to overcome presumption against prior restraint.)

Lilly's Memo reveals otherwise.  Lilly complains that the Documents were "selectively" released to advance "an agenda" (apparently referring to the undisputed testimony in the record that Mr. Gottstein, Dr. Egilman and the other Respondents wanted to protect the public health, save lives, and reveal illegality and fraud by Lilly).  Memo at 1.  It complains that the Respondents' speech here — the documents they chose to distribute — was a "biased selection."  *Id.*  It expresses concern that communication of this information concerning illegality and deception will "cause harm to Lilly."  1-2.  It suggests that the information could be or has been used in a "selective or distorted way," presumably referring to the New York Times articles and other news articles on December 17, 2006, and since, although it may also be referring to the existence of the Zyprexa Documents available on a number of websites, including those referred to in the Electronic Frontier Foundation filings.  Lilly argues that this information should not be distributed, because "vulnerable patients taking lifesaving medications should be guided by their doctors," Memo at 2, but of course ignores the fact that their present motion is aimed at suppressing this information so that 1) these vulnerable patients' doctors cannot see these Documents, and 2) these vulnerable patient's doctors cannot benefit from academic researchers (like Dr. Cohen), or journalists or authors with expertise in this area (like Robert Whittaker), or prominent experts and activists in this field (like Vera Sherav) making use of these documents to provide more data and analysis into the marketplace (of ideas and commerce) to be used in making fully informed decisions, and 3) these vulnerable patients might learn enough to ask questions of their doctors (or that guardians or courts might ask questions of prescribing doctors or institutions) about whether they are being prescribed drugs for off-label uses as a result of illegal marketing by Lilly

shown by these documents. Parents of young children, or adult children of the elderly, might find out information from these Documents Lilly is suppressing so that they can help these vulnerable populations get all the information they can to assess safety, efficacy, risks and alternatives. The Supreme Court has recognized that in some instances, third parties might have different or better information than a patient's own doctor, or important additional information. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 767, 96 S.Ct. 1817, 1828 (1976). Pharmaceutical consumers, and the public at large, are entitled to information from any sources, without Eli Lilly or the court censoring it for their presumed good.

Both the Respondents' rights to communicate the information in the Zyprexa Documents *and* the right of patients, doctors, journalists, researchers, human rights activists and others who wish to *receive* this information, are protected by the First Amendment. *Id.,* 425 U.S. at 756-757, 96 S.Ct. at 1823. The U.S. Supreme Court has recognized that citizens have a need and desire for a free flow of information about prescription drugs that "may be as keen, if not keener by far, than his interest in the day's most urgent political debate.[7] ...

> Those whom the suppression of prescription drug price information hits the hardest are the poor, the sick, and particularly the aged. A disproportionate amount of their income tends to be spent on prescription drugs; yet they are the least able to learn, by shopping from pharmacist to pharmacist, where their scarce dollars are best spent. When drug prices vary as strikingly as they do, information as to who is charging what becomes more than a convenience. It could mean the alleviation of physical pain or the enjoyment of basic necessities.

---

[7] *Virginia Board of Pharmacy* involved "pure commercial speech" (drug price information), protection for which was not settled categorically until this very case. The Court's observations about the Free Speech interests apply *a fortiori* here, where the information at issue goes well beyond this into the realm of dialogue about important, even life and death, public health issues.

425 U.S. at 764; 96 S.Ct. at 1827.  The Court further noted:

> So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed." … To this end, the free flow of commercial information is indispensable.  … And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal.

425 U.S. at 765; 96 S.Ct. at 1827 (internal citations omitted).

Lilly asserts that Magistrate Judge Chrien, reviewing the parties' proposed protective order, "foresaw how the select disclosures of information could harm Lilly" and, potentially, patients, "if the newspapers are slathered with material that might be misunderstood by the lay reader, that might do some harm or prejudge a case that is still pending."   This is not an appropriate judicial role, to decide for citizens whether they will properly understand what the Zyprexa Documents say, or how they should be interpreted, and to order that information be withheld from people who might not understand it. Lilly asks this court, as it asked the magistrate, to assume a need for protectiveness of its customers — the pharmaceutical consuming portion of our nation — that the Virginia Pharmacy Court found "rests in large measure on the advantages of their being kept in ignorance." *Id.*, 425 U.S. at 769; 96 S.Ct. at 1829.  The Supreme Court rejects the notion that certain harms might be avoided if people taking pharmaceutical drugs are not permitted to have certain information (in that case, pricing information). "There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their

own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Id., * 425 U.S. at 770; 96 S.Ct. at 1829.  The Court notes that the choice among alternative approaches for responding to information relating to pharmaceuticals in that case was not for the courts or legislatures.  "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Id.*

Further, Lilly's patronizing attitude ignores the fact that knowledgeable journalists, such as those covering health issues for the New York Times, or authors, like Mr. Whittaker, or academic researchers like Dr. Cohen, could be presumed by the court to provide a context and basis for understanding at least one side of the story, though perhaps a different side than Lilly chooses to present. The court has *no business* making documents secret so that we don't run the risk of our citizens not being smart or capable enough to understand them.

Lilly complains that the documents used are "select," and says Judge Chrien "foresaw the dangers of select disclosures," but that is not a persuasive or lawful reason to restrict Respondents' speech here.[8] Would the public be better served if they had to get all 15,000,000 documents, or none, rather than a meaningful selection?  Lilly simply doesn't like the selection, because it isn't the one making it this time around, and because this selection is presenting another side of the story.  Lilly is free, of course, to do what

---

[8] A "lay reader" having only Lilly's Memo, e.g., might get the mistaken impression that the two sentences Lilly chooses to cite, at pages 9-10 of its Memo, from Jack B. Weinstein, *Secrecy in Civil Trials:  Some Tentative Views*, 9 J.L. & Policy 53, 58 (2000), were fairly representative of that article.  The remedy for this is not to silence Lilly, but to trust to a wide-open and robust exchange.

the First Amendment presupposes here, and tell its side of the Zyprexa story, as it has

been (successfully, to the tune of over $4,000,000,000 annually).  It publicly represents

that as much as it would like to, however, it "cannot," implying that this court is keeping

it from communicating fully and candidly with the public.[9]  In any event, the possibility

that these documents might be reported on selectively or out of context from Lilly's

perspective is insufficient to justify this government restriction on discussing or

disseminating them. Comp., *Condit v. Dunne*, 225 F.R.D. 113, 118 (S.D.N.Y. 2004); *see

also, Virginia Bd. of Pharmacy*, *supra.*

### VI.      Lilly's Claim for Injunctive Relief is Barred
###          By the Unclean Hands Doctrine

As noted in section III.B, above, Lilly has failed to disclose that documents whose

distribution and use it is seeking to enjoin because they are allegedly confidential have in

fact lost their status as confidential. (See, Decl. of D. John McKay, ¶4).  Lilly goes to

great lengths to argue (though unpersuasively) that the Documents must properly be

deemed confidential, even submitting selective portions of sealed filings, without

authorization to do so and without allowing respondents the opportunity to review the

context or remaining portion of the filings from which the leaked document is taken.  (*Id.,*

¶3, 6).  It even goes so far as to affirmatively represent, in footnote 9 of it Memo, that the

proper forum for addressing the status of these Documents' confidentiality is in a

proceeding brought pursuant to CMO-3, ¶9.  Yet remarkably, it fails to reveal that over a

year ago, as a result of its participation in precisely this kind of proceeding, the Zyprexa

documents <u>lost their status as confidential.</u> (*Id.)* Thus, the entire time that Lilly has

---

[9] *See,* December 18, 2006, "Dear Healthcare Professional" letter from Eli Lilly
Vice President Steven Paul, M.D., at http://psychrights.org/index.htm

enlisted the aid of Judge Cogan and this court to restrain the First Amendment and other

rights of respondents, including Mr. Gottstein, in an effort to undo the effects of its latest

failure to timely object to lifting the secrecy of these vitally important documents, it has

kept hidden the fact that, if CMO-3 is to be given effect, these documents are not

confidential — contrary to what Lilly has continually represented to the court, the parties,

and respondents. In *Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S. 240, 244, 54

S.Ct. 146, 78 L.Ed. 293 (1933), the United States Supreme Court considered "the

meaning and proper application of the maxim … He who comes into equity must come

with clean hands."   The court noted that:

> [T]he words and the reasons upon which it rests extend to the party seeking relief
> in equity. 'It is one of the fundamental principles upon which equity jurisprudence
> is founded, that before a complainant can have a standing in court he must first
> show that not only has he a good and meritorious cause of action, but he must
> come into court with clean hands.  *He must be frank and fair with the court,
> nothing about the case under consideration should be guarded, but everything
> that tends to a full and fair determination of the matters in controversy should be
> placed before the court.'*  Story's Equity Jurisprudence (14th Ed.) s 98.   The
> governing principle is 'that whenever a party who, as actor, seeks to set the
> judicial machinery in motion and obtain some remedy, has violated conscience, or
> good faith, or other equitable principle, in his prior conduct, then the doors of the
> court will be shut against him in limine; the court will refuse to interfere on his
> behalf, to acknowledge his right, or to award him any remedy.'  Pomeroy, Equity
> Jurisprudence (4th Ed.) s 397.

290 U.S. at 244-245 (emphasis added). Lilly's failure to disclose the UCFW proceedings

and its action leading to loss of confidential status for these documents may not rise to the

level of its misconduct in *Fentress v. Eli Lilly & Co.*, and other proceedings relating to

the Prozac/Wesbecker matter,[10] but it goes directly to the core issues involved in these

---

[10]   Discussed in the recently filed Memorandum of MindFreedom, et al. in
Support of Motion to Modify CMO-3, Dkt. No. 68, at 6, and discussed in greater detail in
Zitrin, Richard and Carol M. Langford, *The Moral Compass of the American Lawyer*
(Ballentine Books, New York, 1999), at 193-203.

injunction proceedings, previous related proceedings concerning respondents, and the continuously threatened contempt proceedings.  It clearly "in some measure affect(s) the equitable relations between the parties in respect of something brought before the court for adjudication" and the "advancement of right and justice" dictates that the court take this into account.  *Keystone*, at 245.

## VII.    The Court Should Not Enter An Injunctive Decree That Would Be Impracticable to Enforce

The federal court sitting as a court of equity should exercise its power to enjoin "with great reluctance when it will be difficult to secure compliance with any resulting decree," *Vanity Fair Mills, Inc. v. T. Eaton Co*., 234 F.2d 633, 647 (2d Cir. 1956); *see also*, *Bethlehem Engineering Export Co. v. Christie,* 105 F.2d 933, 935 (2d Cir. 1933) (L. Hand, denying injunctive relief as impracticable); *cf.*, *Restatement (Second) of Torts, §943, comment a* ("If drafting and enforcing a decree are found to be impracticable, the injunction should not be granted.')  .  The court noted from the outset the obvious concerns with issuing an in injunction in the case, even assuming one were warranted, noting, for example, that *The New York Times* — from whom Lilly never sought return of the documents or other injunctive relief — had the documents and could use them. Since then, the fact that the Documents are available on various websites, in this country and elsewhere in the world, also demonstrates the futility of the relief requested by Lilly. The fact that, as noted in the preceding section, the Documents have lost their confidential status in accordance with the terms of CMO-3, not just by virtue of Lilly's failure to timely object to Mr. Gottstein's subpoena, but by virtue of its independent

failure to timely oppose making them public in the Third Party Payors' earlier CMO-3, ¶9 proceedings, leaves no doubt that the injunctions Lilly seeks to continue and extend here cannot be meaningfully, fairly, or consistently implemented or enforced.  Just as this court refused to allow withholding documents in the tobacco litigation both because they were already available on the internet, *and* because the public interest was served by doing so, *see, Falise v. American Tobacco Co*., 193 F.R.D. 73, 82-83 (S.D.N.Y. 2000), refusing to enjoin further distribution and use of the Zyprexa Documents by scholars, journalists, doctors, litigants, patients' rights advocates, and others, is a recognition of both what is practical and what is right.

### VIII. The  Court Should Restore the Status Quo Ante By Ordering the Return of the Documents to All Those Individuals Who Gave Up Their Copies to the Special Master.

If the court denies Lilly's motion to extend the injunction, as part and parcel of this order, it should make clear that Mr. Gottstein is entitled to use the Documents in his state court litigation without further delay.  Mr. Gottstein's client, and all those who will benefit from this strategic litigation he has undertaken, involving important rights of those diagnosed with serious mental illness.   It would make no sense for the court to refuse to extend, and dissolve, the injunctions prohibiting distribution and use of the Zyprexa Documents, and require Mr. Gottstein to go to the internet for the copy of the Documents to be used in his court proceedings.

Mr. Gottstein turned over to Special Master Woodin the Documents that he obtained pursuant to his lawful subpoena, issued December 6, 2006, and out of respect for the court's order despite his belief that Lilly was and is not entitled to this relief.  He

requests that the court restore the *status quo ante* upon dissolving the injunction in this case, and return to him these Documents so that he can use them as originally intended. In particular, he needs them for the case in which he originally subpoenaed them, to prepare for motion practice, hearings, and for the testimony of his other expert, Dr. Grace Jackson.   The documents should also be returned, upon dissolution of the injunction, to anyone who, as a result of Lilly's actions, provided their copies to the Special Master.

### IX.  The Court Should Reject Lilly's Proposed Findings

#### A. Verified Opposition to Lilly's Proposed Findings

The court stated at the close of the hearing that Mr. Gottstein could "respond by affidavit to the characterization of any document" and rather than duplicate matters with a separate opposition and supporting affidavit. Mr. Gottstein has submitted herewith a detailed Verified Opposition to Lilly's January 31 "Amended Proposed Findings of Fact," and in addition, has submitted herewith proposed Findings of Fact and Conclusions of Law with respect to matters most directly affecting him.

#### B.  No Inferences Should Be Drawn Adversely Affecting the Interests of Mr. Gottstein or Other Respondents As a Result of Dr. Egilman Asserting His Fifth Amendment Privilege In Connection With Another Proceeding, After the Conclusion of Proceedings Relating to the Injunctions

Drawing adverse inferences is one thing.  Making up or conjecturing about facts is quite another.  In fact, though, Lilly is entitled to neither in the context of this proceeding.  Quite apart from the fact that its proposed findings are overreaching and unsupported, Lilly waived any right to use this device when it expressly chose not to call Dr. Egilman as a witness to help meet its burden in the injunction proceedings, knowing that the court had expressly stated that no factual findings could be assumed based on the

record to date.  Dr. Egilman took the 5th only with respect to a deposition noticed by

Lilly for purposes of pursuing contempt charges, after the proceedings relating to the

motion before the court had terminated, and Lilly had stated it did not intend to call Dr.

Egilman for the injunction hearing.

Whether it might arguably be appropriate to draw some adverse inferences against

Dr. Egilman if and to the extent Lilly were seeking through these proceedings to enjoin

**him**, it is not.   It is inappropriate for Lilly to attempt to draw and use adverse inferences,

let alone make up facts and supply alleged facts that could have been introduced in a

timely and fair way through witnesses called or documents produced when the court gave

Lilly almost two weeks notice of its intent to conduct a full evidentiary hearing and

ordered it to identify in advance the witnesses it intended to call and documents it

intended to rely upon.  (*See*, Tr. 1/8 Hrg., at 27; and *see*, January 12, 2007, letter from

Nina Gussack to Hon. Jack B. Weinstein, attached as Ex. 2 to accompanying Declaration

of Counsel, advising the court of Lilly's choice to call no witnesses at all).

It is especially inappropriate to cloud the record in the instant injunction

proceedings with facts that are manufactured from supposed "inferences," and with

assertions of fact that could readily have been established in other ways — and that all

parties might have had the chance to cross-examine and rebut — if Lilly had revealed at

or before the hearing of its intention to use Dr. Egilman's "inferred" testimony.

C. **Demeanor and Credibility**

Lilly's submissions are replete with unfounded, unfair, and unsupported

characterizations of alleged facts, and, as well, with false statements and distortions.  It is

a lot of smoke, and it appears that Lilly's hope is that the court will assume from this

crowded pleading that there is also fire.  There is not, though there is no question that there are many passionate advocates happy about the prospect of public access to these documents affecting the lives of millions around the world.

Lilly's repeated references to schemes and subterfuge, as well as its more direct attacks, impugn the integrity and impeach the credibility of Mr. Gottstein.  Similarly, it attempts to vicariously impeach the credibility of Mr. Gottstein and other respondents by its characterizations of Dr. Egilman, and its promiscuous use of "inferences" since the doctor has asserted his Fifth Amendment privilege.

No findings of fact reflecting adversely on the credibility or integrity of James Gottstein are appropriate in this case. The court was in a position to observe demeanor. Jim Gottstein was nothing if not candid.  He cut his vacation short and flew to New York to assist the court in this fact finding endeavor.  He produced voluminous documents on the shortest possible notice, without an opportunity for review by his counsel or in many cases, himself, and provided technical assistance to opposing counsel to facilitate their timely use of these documents.

There is not a hint of any improper purpose for anything Mr. Gottstein is accused of doing. It is undisputed that he, perhaps alone among the many lawyers involved in the Zyprexa litigation (other than respondents' counsel) does not have or have clients who have a financial interest in the Zyprexa litigation.  He is providing pro bono representation to a client diagnosed with serious mental illness, seeking to further establish — as he has in his earlier precedent-setting litigation in this area — important civil rights protection for his client all similarly situated individuals.  In the

groundbreaking *Myers* case decided by the state's highest court last year,[11] access to documents about drugs and drug company practices – particularly, but not limited to Eli Lilly's Zyprexa — was critically important.  (Tr. January 17, Hrg Ex. 6)  He believes in good faith that the Documents he subpoenaed will be similarly important to his present representation of B.B

D.   **The Court Should Disregard the Demonstrably Lilly's False Representations of Fact Except As Evidence of the Trustworthiness of Its Assessment of the Evidence**

Much of the distortion or misstatement of facts Respondents object to is presumably attributable to overzealous advocacy, a desire to portray everything in the worst possible light, and the inevitable misinterpretations that occur when one is unfamiliar with fact or documents and can't or doesn't communicate with those with knowledge of the facts.  One set of false statements in the recent pleadings was particularly troubling, because Lilly falsely represented certain key facts —it asserted that the court should enter injunctions against various individuals because they had allegedly not returned the Documents sent to them, when in fact this was simply wrong.   For example, Judith Ziegler, had her documents returned unopened before the first injunction was entered.  We have absolutely no reason to believe that opposing counsel would knowingly misrepresent these facts, and do not believe this.  It is noted here, though, as an example of how an adversary, already of a frame of mind to characterize everything in a light most harshly and unfavorably, can cause substantial problems for people who deserve better.  Undersigned counsel was able to determine within hours on the day after Lilly made its filing, by checking with the Special Master, who had turned the documents

---

[11] *Myers v. Alaska Psychiatric Institute*, 138 P.3d 238 (Alaska 2006)

in.  Presumably, if Lilly had made a formal request for this information before it filed,

indicating the importance of having complete information, the problem might have been

avoided.  Lilly's counsel had had a document for two weeks before it filed, for example,

showing that Ms. Ziegler said she was sending her documents to the Special Master.  If

that information were disclosed, it might have helped facilitate a search.  In any event, it

is an object lesson that helps underscore the unreliable quality of proposed findings

driven by a desired outcome rather than attention to factual details.


## X.  This Court Had No Jurisdiction Over Mr. Gottstein

In asserting that this Court has jurisdiction over Mr. Gottstein by virtue of his

alleged "aiding or abetting," "acting in concert," or being in a "conspiracy," Lilly both

misstates the cases it cites and mixes in cases not involving the jurisdictional question.

For example, Lilly cites *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985)

and *United States v. Schine*, 260 F.2d 552, 556 (2d Cir. 1958) for the proposition that "A

person subject to an injunctive or protective order may not work through or enlist others

to effect a violation of that order: Such an order 'binds not only the parties subject thereto,

but also nonparties who act with the enjoined party.'"[12]  (emphasis added).

However, these cases do not support the proposition that the far-ranging and

extraordinary reach of injunctions under F.R.C.P. 65(d) to "persons in active concert or

participation" includes protective orders issued under F.R.C.P. 26.[13]  Both *Waffenschmidt*

and *Schine* involve injunctions.  So does *Stiller v. Hardman*, 324 F.2d 626 (2d Cir. 1963)

---

[12] Lilly January 31 Brief at 7.

[13] In some situations, such as domestic violence orders, the orders are called "protective orders," but their nature is an injunction under F.R.C.P. 65, not discovery protective orders under F.R.C.P. 26(d).

and doesn't even address the issue of a non-party who might be subject to it because of "active concert or participation."

     *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932), not only involved an injunction, but also a party.  The personal jurisdictional issue there was not "active concert or participation," but whether the party could escape personal jurisdiction "by absenting itself from the district."[14]  *Wards Co. v. Jonnet Dev. Corp. (In re Lafayette Radio Elecs.)*, 761 F.2d 84, 92 (2d Cir. 1985); cited by Lilly, had nothing to do with jurisdiction over a non-party based on "active concert or participation."

     There are many cases that use the language "court order," but all the ones reviewed either involve injunctive relief or parties.   While it is often assumed that courts have whatever authority necessary to enforce their orders, with respect to non-parties, F.R.C.P. 71 clearly recognizes there are jurisdictional limits to "when obedience to an order may be lawfully enforced against a person who is not a party."  F.R.C.P. 65(d) exercises extraordinary jurisdictional reach to anyone in "active concert or participation" with respect to injunctions.  F.R.C.P. 26 in stark contrast very carefully distinguishes between parties and non-parties and limits its reach against non-parties.

     These types of jurisdictional issues can be thorny, and it may turn out that the analysis set forth here is incorrect.  However, none of the cases cited by Lilly support the contention that protective orders issued under F.R.C.P. 26(c) bind those in "active concert or participation," as opposed to being "legally identified with."

     Mr. Gottstein expressed skepticism of this Court's jurisdiction over him from the very beginning and has never waived the objection.  Nevertheless, he has been

---

[14] *Id.* at 454.

extraordinarily cooperative, complying with the order putatively ordering him to retrieve and return the documents and cutting his family vacation short so he could travel from Alaska to Brooklyn to testify fairly[,] fully and openly,"[15] resulting in "a fairly full revelation" of the circumstances surrounding the production of the documents pursuant to the Alaska subpoena.[16]  As set forth above, Mr. Gottstein believes no violation of CMO-3 has been shown, and even assuming *arguendo* that it did, nothing he did brought him within the ambit of such violation because his efforts were to follow CMO-3, not violate it.  However, if the Court should decide otherwise, it appears it simply does not have jurisdiction over Mr. Gottstein on the basis of his activities surrounding his subpoenaing the documents.

Finally, Mr. Gottstein wishes to note that he has not waived his jurisdictional objection asserted from the outset, so that should the court find no violation of CMO-3, or in any event, no improper aiding and abetting or similar culpable conduct, then under *Alemite* the court lacks jurisdiction over him.

**CONCLUSION**

Lilly had a reasonable opportunity to object to disclosure of these Documents — twice —  and failed to do so both times, so that the Zyprexa Documents should be made freely available to the public at once, for the reasons noted above. Perhaps as important as anything, this court should take a broader perspective on what Lilly is asking it to do, and refuse to use its good offices to assist in a reprehensible scheme of suppressing

---

[15] Tr. of 1/17 Hr'g, at 250
[16] Tr. of 1/17 Hr'g, at 248

information about this drug and the companies marketing practices.  While Lilly is telling

its side of the Zyprexa story in many forums, including marketing efforts[17] it has not only

enlisted this court in suppressing the Zyprexa Documents to stifle a broader public

debate, but has also involved the court in approving a Settlement Agreement that imposes

even greater restrictions on the use of the documents and — in an especially egregious

provision — prohibits the 8,000 men, women and children who were harmed by this drug

from being able to tell others anything about their own personal tragedies.  They cannot

even publicly discuss what happened to them with groups of doctors who might be

interested in getting more knowledge to use in treating their patient, or speak to mental

health consumers or providers to share their personal stories.[18]  This is a shame



Dated: February 9, 2007                    Respectfully submitted,



                                           /s/D.JohnMcKay/


                                           _____
                                           by: D. John McKay
                                               Law Offices of D. John McKay
                                               117 E. Cook Ave.
                                               Anchorage, Alaska 99501
                                               Phone: (907) 274-3154
                                               Fax:    (907) 272-5646
                                               E-mail:mckay@alaska.net


_____

[17]   See, e.g., Pepper Hamilton website,
*http://www.pepperlaw.com/pdfs/PepperHamilton2005annualreview.pdf*, at p. 3.
[18]   *See,* Settlement, *supra*, §O.2